# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| _____ x | | |
| In re MUTUAL FUNDS INVESTMENT LITIGATION | : : : | MDL No. 1586 |
| -------------------------------------------------------- | : | |
| This Document Relates To: | : : | |
| *In re Alger, Columbia, Janus, MFS, One Group, Putnam, and PIMCO,* Civil Action No. 04-md-15863 | : : : : | |
| _____ | : | |
| CRAIG WIGGINS, *et al.* | x : : | Civil Action No. 04-cv-00818 |
| V. | : : | |
| JANUS CAPITAL GROUP INC., *et al.* | : : | |
| _____ x | | |

## SECOND AMENDED COMPLAINT
## FOR THE JANUS PARENT INVESTOR SUB-SUBTRACK

1.      This is a federal class action brought by the Plaintiff on behalf of itself and a Class consisting of all other persons who purchased or otherwise acquired the publicly traded securities of Janus Capital Group Inc. (f/k/a Stilwell Financial Inc.) ("Janus Capital" or "the Company"), between July 21, 2000 and September 2, 2003, inclusive (the "Class Period"), and who still held Janus Capital shares as of September 3, 2003, and who therefore were damaged as a result of defendants' misconduct, seeking to recover damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

**NATURE OF THE CLAIM**

2.       Janus Capital is an asset management firm that launched mutual funds known as the "Janus Funds."  Janus Capital manages the Janus Funds through its wholly-owned subsidiary Janus Capital Management LLC ("Janus Management").  Janus Management serves as investment advisor to the Janus Funds, and, in that capacity is responsible for the funds' day-to-day management.  The bulk of Janus Capital's revenues come from its creation and operation, directly or through subsidiaries, of the Janus Funds (which, collectively, as of April 2004 had $145 billion of assets under management).  Defendants Janus Capital and Janus Management are referred to herein collectively as "Janus."

3.       The investment management services provided to the Janus Funds were performed pursuant to advisory contracts, which provide for fees payable to the Janus company that manages the account.  The amount of the fees varies depending on the individual mutual fund or account, and is usually based in substantial part on the level of assets under management.

4.       Janus Capital's revenue is derived primarily from investment management and 12b-1 fees received from the Janus Funds.  Investment advisory revenues depend largely on the total value and composition of assets under management.

5.       Janus represented that its mutual funds were designed to be long-term investments for "buy and hold" investors and were therefore favored investment vehicles for retirement plans.  Certain investors, however, have attempted to use mutual funds to generate quick profits by rapidly trading in and out of certain mutual funds.  Typically, these so-called "market timers" seek to capitalize on stale fund prices, often focusing on price discrepancies involving international funds – where the stocks that comprise the fund trade on exchanges whose operating

2

hours are different from those of U.S. markets.  Market timers take advantage of price inequities, but do so at the expense and to the detriment of long-term shareholders.

6.      Defendants caused mutual fund prospectuses to be issued for Janus mutual funds and made them available to the investing public, which created the misleading impression that defendants would implement measures to curb market timing in the Janus Funds.  As recognized in the prospectuses, Janus' purported market timing policy was designed to protect long-term investors from the negative effects of excessive trading, including, but not limited to:  dilution of share value, negative tax consequences, increased transaction costs, and loss of fund investment opportunities.

7.      The accuracy of defendants' representations concerning market timing restrictions were of utmost importance to investors in the Janus Funds.  Long-term holders would be less likely to invest in Janus Funds absent protection against market timing.  Because Janus Capital's revenue depends on attracting and keeping fund investors, and because Janus Capital faces liability exposure if it or its employees or its controlled subsidiaries are found to have misrepresented a fundamental policy, the accuracy of these representations is also material to investors in the common stock of Janus Capital Group.

8.      Unbeknownst to Janus fund investors and to Janus Capital common stock investors, throughout the class period Janus was secretly operating many of the Janus funds in a manner inconsistent with Janus' publicly-stated policies concerning market timing.  New York Attorney General Elliot Spitzer found, in his investigation of the mutual fund industry, that Janus had entered into secret arrangements with several hedge funds whereby Janus agreed to allow market timing transactions by those hedge funds and agreed to suspend the fees and other measures that Janus had in place to deter market timing.  The Attorney General's evidence includes emails

from Richard Garland, who was the former head of Janus' international operations and who reported directly to former Chief Executive Officer, Mark Whitson.  In the emails, Garland advocates allowing a hedge fund to engage in market timing in exchange for a payoff, notwithstanding Janus' publicly-stated policies against such transactions.  Furthermore, according to Attorney General Spitzer, knowledge of the misconduct went "up to the very senior levels in the management to the Janus funds."  In fact, at least one market source claimed to have uncovered a memo evidencing Mr. Whitson's direct knowledge of the market timing activity in 2002.  Following the filing of Attorney General Spitzer's complaint, Janus admitted to having engaged in secret market timing arrangements with hedge funds during the period of November 2001 through April 2003.

9.      In the wake of the Attorney General's release of its evidence in September 2003, and Janus' own subsequent admissions, several Janus executives were forced to resign, including the Chief Executive Officer, Mark Whitson; Lars Sodenberg, who headed Janus' institutional business; and Richard Garland, who headed Janus' international operations.  Furthermore, Janus ultimately paid more than $325 million in fines and penalties to settle claims by various regulatory agencies.

10.     Needless to say, the realization that Janus had lied about the policies allegedly in place to protect long-term investors caused a tremendous erosion of trust and confidence among mutual fund investors.  The revelations by the Attorney General and subsequent admissions by Janus triggered an unprecedented level of divestiture from the Janus Funds.  In the six months between September 2003 and February 2004, investors withdrew $14 billion from the Janus Funds, more than triple the rate of withdrawals for the previous six months.  Relatedly and predictably, Janus' exposure to regulatory penalties and the exodus of mutual fund investors caused a crisis in

confidence among Janus Capital Group common stock investors.  Thus, the price of Janus Capital Group common stock plummeted approximately 25% from $17.86 on September 2, 2003 to $13.50 on September 26 of that year, as news of the previously-concealed market timing arrangements became known to the public.  This diminution in the value of the shares that class members purchased at artificially inflated prices during the class period caused injury to class members.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

12.     This court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

13.     Venue was proper in the District of Colorado (where this action was initially commenced) pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because Janus Capital and Janus Management are headquartered in that District, and many of the acts and practices complained of herein occurred in substantial part in that District.  This action is currently pending in the District of Maryland pursuant to order of the Judicial Panel on Multidistrict Litigation.

14.     In connection with the acts, conduct and other wrongs alleged in this amended complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephonic communications and the facilities of the national exchange.

## THE PARTIES

15.     Lead Plaintiff, First Derivative Traders, purchased Janus Capital securities

5

during the class period, and held many of those shares through the price declines that resulted from the corrective disclosures on and after September 3, 2003 (which are described in paragraphs 91, 105-112, *infra*), as set forth in the certification filed at the time this law suit was initially commenced.  As a result of the foregoing, lead plaintiff has suffered damages as a result of the wrongful acts of defendants as alleged herein.

16.     Defendant Janus Capital is a corporation organized and existing under the laws of Delaware with its principal place of business located at 100 Fillmore Street, Denver, Colorado 80206.  Janus Capital is the product of a merger of Janus Capital Corporation into Stilwell Financial, Inc.

17.     According to Janus Capital's Form 10-K for the period ended December 31, 2002, the Company "sponsors, markets and provides investment advisory, distribution and administrative services primarily to mutual funds...."  Fees from the management of mutual funds have constituted more than 90% of the Company's revenue and income.  The management of the Janus Funds is not merely a small division of some huge conglomerate's business.  Managing and advising mutual funds is Janus Capital's primary business.

18.     Defendant Janus Capital Management LLC ("Janus Management") is a wholly-owned subsidiary of Janus Capital Group, and is located at 100 Fillmore Street, Denver, Colorado 80206.  According to the Janus Mercury Fund February 28, 2003 prospectus, Janus Management (together with its predecessors) has served as investment advisor to the Janus Funds since 1970, and currently serves as the investment advisor to all of the Janus Funds, acts as sub-advisor for a number of private-label mutual funds, and provides separate account advisory services for institutional accounts.  Janus Management, as investment advisor to the funds, is responsible for

6

the day-to-day management of its investment portfolio and other business affairs of the funds. Janus Management furnishes advice and recommendations concerning the funds' investments, as well as administrative, compliance and accounting services for the funds, and the funds pay Janus Management a management fee, which is calculated daily and paid monthly.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a federal class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class"), consisting of those who purchased the securities of Janus Capital between July 21, 2000 and September 2, 2003, inclusive (the "Class Period"), and who still held Janus Capital shares as of September 3, 2003.  Excluded from the Class are defendants, the officers and directors of Janus Capital and its subsidiaries, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

20.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Janus Capital common shares were actively traded on the New York Stock Exchange ("NYSE").  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  During the class period, Janus Capital had more than 235 million shares outstanding, and average daily trading volume is significantly in excess of 1 million shares.  Record owners and other members of the Class may be identified from records maintained by Janus Capital or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

7

21.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

22.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

23.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Janus Capital and its subsidiaries including the Janus Funds and their managers;

(c)     whether defendants breached any duty to convey material facts or to correct material facts previously disseminated;

(d)     whether the defendants acted willfully, with knowledge or recklessly, in omitting and/or misrepresenting material facts;

(e)     whether the market prices for Janus Capital securities were artificially inflated as a result of defendants' conduct;

(f)     whether the decline in the market prices for Janus Capital securities beginning in September 2003 resulted from corrective disclosures of facts that were previously misrepresented or omitted by defendants; and

(g)      to what extent the members of the Class have sustained damages and the proper measure of damages.

24.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for many members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## BACKGROUND

## The Problem with Market Timing

25.      Mutual funds are meant to be long-term investments. They are designed for buy-and-hold investors, and thus are the favored repository for long-term goal oriented investment accounts. In spite of this, quick-turnaround traders frequently try to trade in and out of certain mutual funds in order to exploit the inefficiencies in the way they set their Net Asset Values ("NAVs").

26.      "Market timers" seek to capitalize on the fact that some funds use "stale" prices to calculate the value of securities held in their portfolio, prices which do not necessarily reflect the "fair value" of such securities as of the time the NAV is calculated. A typical example is a U.S. mutual fund that holds Japanese shares. Due to the time zone difference, the Japanese market may close at 2:00 a.m. New York time. If the U.S. mutual fund manager uses the closing prices of the Japanese shares in her fund to calculate an NAV at 4:00 p.m. in New York, she is relying on market information that is fourteen hours old. Any positive market moves during the

New York trading day that will likely cause the Japanese market to rise when it later opens will not be reflected in the "stale" Japanese prices, and thus the overall fund's NAV will be artificially low. A trader who buys the Japanese fund at the "stale" price is virtually assured of a profit that can be realized the next day by selling.  This and similar strategies are known as "time zone arbitrage." Taking advantage of this kind of short-term arbitrage repeatedly in a single mutual fund is called "timing" the fund.

27.     Effective timing captures an arbitrage profit, which comes dollar-for-dollar from the pockets of long-term investors.  The timer steps in at the last minute and takes part of the buy-and-hold investors' upside when the market goes up; and as a result the next day's NAV is reduced for those who are still in the fund.  Conversely, if the timer sells short on days market prices are falling, the arbitrage has the effect of making the next day's NAV lower than it would otherwise have been, thus magnifying the losses that investors are experiencing in a declining market.

28.     Besides the wealth transfer of arbitrage (known as "dilution"), timers also harm their target funds by imposing unnecessary transaction costs on the funds through their frequent trading.

### The Importance of Anti-Market Timing Safeguards

29.     Were investors aware that the Janus Funds were subject to dilution and were being saddled with extra costs as a result of market timers, they would be far less attracted to investing in those funds.

30.     If mutual fund investors were less attracted to investment in Janus Funds, they would shift their money into other investments.  This decrease in funds under management at Janus would have a direct impact on Janus' bottom line and affect the profitability and attractiveness of

Janus Capital's common stock, given the fact that such a large portion of Janus Capital's revenues come from fees that are based on the amount of funds under management in the Janus Funds.

31.     It is for this reason, among others, that Janus wrote and represented its policy against market timers, recognizing the additional costs and other adverse effects that market timing and other short-term trading places on mutual funds.

32.     Mutual fund managers are well aware of the damaging effect that timers have on their funds.  One study estimated that U.S. mutual funds lose $4 billion per year to timers.  Eric Zitzewitz, Who Cares About Shareholders? Arbitrage-Proofing Mutual Funds (October 2002) 35, http://faculty-gsb.stanford.edu/zitzewitz/Research/arbitrage1002.pdf.     While it is virtually impossible for fund managers to identify every timing trade, large movements in and out of funds are apparent.  Moreover, mutual fund managers have several ways of fighting back against timers.

33.     Mutual fund managers generally have the power simply to reject timers' purchases.  Many funds have also instituted short-term trading fees ("early redemption fees") that effectively wipe out the arbitrage profits that timers exploit, thereby removing the incentive to engage in the market timing trades.  Typically, these fees go directly into the affected fund to reimburse it for the costs of short term trading.  In addition, fund managers are required to update NAVs at the end of the day in New York when there have been market moves that might render the NAV stale.  This is called giving the fund a "fair value," and eliminates the timers' arbitrage.  As fiduciaries for their investors, mutual fund managers are obligated to use their best efforts to employ these available tools to protect their customers from the dilution that timing causes.

34.     Notwithstanding the clear harm that timing causes, and fund managers' relatively easy ability to prevent large-scale timing, fund managers nonetheless sometimes succumb

to incentives to allow their funds to be timed.  Typically a single management company sets up a number of mutual funds to form a family.  Janus Management is the manager for the Janus family of funds.  While each mutual fund is in fact its own company, as a practical matter the management company runs it.  The portfolio managers who make the investment decisions for the funds and the executives to whom they report are all typically employees of the same management company, not the mutual funds themselves.  Still, the management company owes fiduciary duties to each fund and each investor in addition to investors of the management company's own securities.

35.     The management company makes its profit from fees it charges the funds for financial advice and other services.  Such fees are typically a percentage of the assets in the fund, so the more assets in the family of funds, the more money the manager makes.  Knowing this, the timer frequently offers the manager more assets in exchange for the right to time.

36.     As an investment advisor selling its own funds, Janus was required to provide to all prospective mutual fund customers a copy of the mutual fund prospectus.  The prospectus must contain all information that a prospective investor would find relevant in making an educated decision to purchase shares of the mutual fund.

37.     Janus' prospectuses did not disclose that certain mutual fund customers were allowed to engage in market timing activity or short-term trading.

## MATERIALLY FALSE AND MISLEADING STATEMENTS MADE DURING THE CLASS PERIOD

38.      Janus fund prospectuses were filed with the Securities and Exchange Commission and are publicly available from a variety of sources.  Janus Capital makes the most recent prospectus for each Janus Fund available on its website, www.janus.com. These prospectuses, which are given to prospective shareholders, included language that said Janus' funds were "not

12

intended for market timing or excessive trading" and said "Janus had measures in place to stop the trading." These statements were materially false and misleading. As New York's Attorney General revealed in September 2003, following a lengthy investigation, and as Janus subsequently admitted, Janus and its subsidiaries had, for years, entered into secret arrangements to allow several hedge funds to engage in market timing transactions in various Janus Funds.

39.     The misrepresentations (some of which are detailed immediately below) attracted and retained investments in the Janus Funds and increased Janus Capital's revenues, thereby artificially inflating Janus Capital's stock price. Had the truth been known, Janus Funds would have been less attractive to investors, and consequently, Janus Capital would have realized lower revenues, so Janus Capital's stock would have traded at lower prices.

40.     The "Excessive Trading Policy" in the February 28, 2003 prospectus for the Janus Mercury Fund (one of the funds in which Janus later admitted to allowing market timing) states:

> Frequent trades in your account or accounts controlled by you can disrupt portfolio investment strategies and increase Fund expenses for all Fund shareholders. The fund is not intended for market timing or excessive trading. To deter these activities, the Fund or its agent may temporarily or permanently suspend or terminate exchange privileges of any investor who makes more than four exchanges out of the Fund in a calendar year and bar future purchases into the Fund by such investor. In addition, the Fund or its agent also may reject any purchase orders (including exchange purchases) by any investor or group of investors indefinitely for any reason, including, in particular, purchase orders that they believe are attributable to market timers or are otherwise excessive or potentially disruptive to the Fund.
>
> Orders placed by an investor in violation of the exchange limits or the excessive trading policies or by investors that the Fund believes are market timers may be revoked or cancelled by the Fund . . .

Virtually identical language was contained in prospectuses for other Janus Funds (*see, infra*, ¶¶ 41, 43, 45, 49, 51), and similar language was contained in prospectuses for numerous other mutual funds.  Nevertheless, as described further below, hedge funds were allowed to time Janus Funds subject to such a prospectus.

41.     The Janus High-Yield Fund is a $940 million fund which has been in existence since December 29, 1995.  Janus Management is also the investment advisor for, and manager of, the Janus High-Yield Fund.  The February 28, 2003 Prospectus for the Janus High-Yield Fund ("Janus High-Yield Fund Prospectus") states that it is "designed for *long-term investors* who primarily seek current income" (emphasis added).  As of September 4, 2003, the Janus High-Yield Fund had a five-year return of 3.85%; three-year return of 4.99%; one-year return of  11.02%; and a return of 8.37% since its inception in December 1995.

42.     The Janus Mercury Fund Prospectus states, with respect to the fund-related fees and expenses an investor may expect to bear along with other shareholders, as follows:

> **Shareholder fees**, such as sales loads, redemption fees or exchange fees, are charged directly to an investor's account.  The Fund is a no-lead investment, so you will generally not pay any shareholder fees when you buy or sell shares of the Fund.
>
> **Annual fund operating expenses** are paid out of the Fund's assets and include fees for portfolio management, maintenance of shareholder accounts, shareholder servicing, accounting and other services.  You do not pay these fees directly but ... these costs are borne indirectly by all shareholders.

43.     The same language is contained, virtually verbatim, in the February 28, 2003 Janus High-Yield Fund Prospectus, with the added provisions, with respect to shareholder fees, that "if you sell shares of Janus High-Yield Fund that you have held for 3 months or less you may pay a redemption fee."

14

44.     With respect to their policy on the Fund's cash position and use of cash,

defendants stated in the Janus Mercury Fund Prospectus, that:

> When the Fund's portfolio manager believes that market conditions
> are unfavorable for profitable investing, or when he is otherwise
> unable to locate attractive investment opportunities, the Fund's cash
> or similar investments may increase.  In other words, the Fund does
> not always stay fully invested in stocks and bonds.  Cash or similar
> investments generally are a residual – they represent the assets that
> remain after the portfolio manager has committed available assets to
> desirable investment opportunities.  However, the portfolio manager
> may also temporarily increase the Fund's cash position to, for
> example, protect its assets, maintain liquidity or meet unusually large
> redemptions.

45.     Again, virtually the identical provision was contained in the February 28,

2003 Janus High-Yield Fund Prospectus:

> When a Fixed-Income Fund's [defined to include the Janus High-
> Yield Fund] portfolio manager believes that market conditions are
> unfavorable for profitable investing, or when he or she is otherwise
> unable to locate attractive investment opportunities, the Fund's cash
> or similar investments may increase.  In other words, the Fixed-
> Income Funds do not always stay fully invested in bonds.  Cash or
> similar investments generally are a residual – they represent the
> assets that remain after a portfolio manager has committed available
> assets to desirable investment opportunities.  However, a portfolio
> manager may also temporarily increase a Fund's cash position to, for
> example, protect its assets, maintain liquidity or meet unusually large
> redemptions.

46.     The Janus Mercury Fund Prospectus also stated, with respect to "Illiquid

Investments," that "[t]he Fund may invest up to 15% of its net assets in illiquid investments," and,

with respect to "Foreign Securities," that "the Fund may invest without limit in foreign equity and

debt securities," and "may invest directly in foreign securities denominated in a foreign currency

and not publicly traded in the United States."  Once more, the identical provisions were contained

in the February 28, 2003 Janus High-Yield Fund Prospectus.

15

47.     Under the heading, "Pricing of Fund Shares," the Janus Mercury Fund

Prospectus stated:

> All purchases, sales and exchanges will be processed at the NAV
> next calculated after your request is received and accepted by the
> Fund (or the Fund's agent).  The Fund's NAV is calculated at the
> close of the regular trading session of the NYSE (normally 4:00 p.m.
> New York time) each day that the NYSE is open.  In order to receive
> a day's price, your order must be received by the close of the regular
> trading session of the NYSE.  Securities are valued at market value
> or, if a market quotation is not readily available, or if events or
> circumstances that may affect the value of portfolio securities are
> identified between the closing of their principal market and the time
> the NAV is determined, at their fair value determined in good faith
> under the procedures established by and under the supervision of the
> Trustees.  Short-term instruments maturing within 60 days are valued
> at amortized cost, which approximates market value.
>
> Because foreign securities markets may operate on days that are not
> business days in the United States, the value of a Fund's holdings
> may change on days when you will not be able to purchase or redeem
> the Fund's shares.

Again, the Janus High-Yield Fund Prospectus contains virtually the identical provision.

48.     Specifically addressing improper practices such as "timing," defendants, in

the Janus Mercury Fund Prospectus, filed on Form N-1A with the Securities and Exchange

Commission on February 25, 2002, underscored that such practices were harmful of the Fund and

its shareholders, and assured investors that they prohibited market timing and used their best efforts

to detect and prevent it, stating:

> Frequent trades in your account or accounts controlled by you can
> disrupt portfolio investment strategies and increase Fund expenses for
> all Fund shareholders.  The Funds are not intended for market timing
> or excessive trading.  To deter these activities, the Funds or their
> agents may temporarily or permanently suspend or terminate
> exchange privileges of any investor who makes more than four
> exchanges out of the Fund in a calendar year and bar future purchases
> into the Fund by such investor.  In addition, the Funds or their agents

16

also may reject any purchase orders (including exchange purchases) by any investor or group of investors indefinitely for any reason, including, in particular, purchase orders that they believe are attributable to market timers or are otherwise excessive or potentially disruptive to the Fund.

Orders placed by investors in violation of the exchange limits or the excessive trading policies or by investors that the Fund believes are market timers may be revoked or cancelled by a Fund on the next business day after receipt of the order.  For transactions placed directly with the Funds, the Funds may consider the trading history of accounts under common ownership or control for the purpose of enforcing these policies.  Transactions placed through the same financial intermediary on an omnibus basis may be deemed part of a group for the purpose of this policy and may be rejected in whole or in part by a fund.

Prospectuses for the Janus Enterprise Fund, Janus Mercury Fund, Janus High-Yield Fund, Janus Worldwide Fund, and Janus Overseas Fund contain the exact same language in their prospectuses filed on Form N-1A with the Securities and Exchange Commission on February 25, 2002.

49.    The prospectus for the Janus Advisor Worldwide Fund and Janus International Growth Fund contains similar language, filed on Form N-1A with the Securities and Exchange Commission on September 30, 2001:

Frequent trading into and out of a Fund can disrupt portfolio investment strategies and increase fund expenses for all shareholders, including long-term shareholders who do not generate these costs. The Funds are not intended for market timing or excessive trading. The Funds and their agents reserve the right to reject any purchase request (including exchange purchases if permitted by your financial intermediary) by any investor or group of investors indefinitely if they believe that any combination of trading activity in the account(s) is attributable to market timing or is otherwise excessive or potentially disruptive to the Fund.  The Funds may refuse purchase orders (including exchange purchases) for any reason without prior notice, particularly orders that the Fund believes are made on behalf of market timers.

The trading history of accounts under common ownership or control

may be considered in enforcing these policies. Transactions placed through the same financial intermediary on an omnibus basis may be deemed part of a group for the purpose of this policy and may be rejected in whole or in part by a Fund. Transactions accepted by your financial intermediary in violation of our excessive trading policy are not deemed accepted by the Fund and may be cancelled or revoked by the Fund on the next business day following receipt by your intermediary.

50.     The Janus Mercury Fund Prospectus elsewhere underscored the purported prohibition of market timing by stating, under a separate heading entitled, "Involuntary Redemptions," that "The Fund reserves the right to close an account if the shareholder is deemed to engage in *activities which are illegal or otherwise believed to be detrimental to the Fund, **such as market timing**.*" The Janus High-Yield Fund Prospectus contains the identical provision.

51.     The following prospectuses of funds in which Janus Capital has since admitted to secretly having permitted market timing contained similar language expressing a prohibition of market timing: Janus Overseas Fund Prospectus dated Jan. 31, 2000; Janus Adviser Worldwide Fund Prospectus dated July 31, 2000; Janus Adviser International Fund Prospectus dated July 31, 2000; Janus Prospectus covering the Janus Advisor Worldwide Fund and Janus Adviser International Fund dated Sept. 30, 2001; Janus Enterprise Fund Prospectuses dated Feb. 2, 2001 and July 31, 2001; Janus Prospectuses covering the Janus Worldwide Fund and Janus Overseas Fund dated Feb. 16, 2001; Janus Mercury Fund Prospectus dated Feb. 16, 2001; Janus Prospectus covering the Janus Enterprise Fund and Janus Mercury Fund dated Feb. 25, 2002; and Janus Prospectus covering the Janus High-Yield Fund dated Feb. 25, 2002.

52.     Nonetheless, in direct contradiction of defendants' public statements in the Prospectuses, defendants permitted and actively facilitated such market timing by entering into relationships with certain hedge funds and other large institutional investors to allow them to

conduct late trading and/or market timing.

**Other Materially False and Misleading Statements (Distorted Financial Results)**

53.     Janus' secret arrangements with hedge funds not only contravened a publicly-stated policy regarding the Company's management of its funds, a policy that attracted long-term investors to the Janus Funds, but it also falsely increased the value of its assets under management through the parking of "sticky assets" by the hedge funds in exchange for the right to market time the Janus Funds.  These misrepresentations fraudulently increased the attractiveness of securities issued by Janus Capital Group by falsely inflating the Company's earnings reports during the Class Period.

54.     On July 21, 2000, the Company, then Stilwell Financial, issued a press release announcing its financial results for the second quarter 2000.  The Company reported second quarter 2000 net income of $151.7 million, or 64¢ per diluted share compared to $70.9 million, or 30¢ per diluted share in second quarter 1999.  For the six months ended June 30, 2000, Stilwell reported net income of $293.7 million, or $1.25 per diluted share, compared to $131.9 million, or 56¢ per diluted share, for the same 1999 period.

55.     On August 14, 2000, the Company filed its quarterly report with the SEC on Form 10-Q.  The Company's Form 10-Q reaffirmed its previously announced financial results.

56.     On October 26, 2000, the Company issued a press release to announce its financial results for the third quarter of 2000.  Therein, the company reported second quarter 2000 net income of $170.1 million or 73¢ per diluted share, compared to $82.7 million, or 36¢ per diluted share, in the third quarter 1999.  For the nine months ended September 30, 2000, Stilwell reported net income of $510.5 million, or $2.23 per diluted share, compared to $214.6 million, or 95¢ per

diluted share, for the same period in 1999.  Average assets under management in the third quarter

were $324.2 billion, a 97% increase from the same period in 1999.  Since September 30, 1999, the

substantial growth in assets under management resulted in an increase in revenues from $311.2

million to $609.5 million.

       57.     On November 14, 2000, the Company filed its quarterly report with the SEC

on Form 10-Q.  The Company's Form 10-Q reaffirmed its previously announced financial results.

       58.     On January 30, 2001, the Company announced its financial results for the

fourth quarter and year-end 2000.  At that time, Stilwell reported net income of $153.2 million, or

66¢ per diluted share, during the fourth quarter 2000 compared with net income of $98.5 million,

or 43¢ per diluted share, in the fourth quarter 1999.  For the full year 2000, Stilwell's net income

was $663.7 million, or $2.90 per diluted share, compared with $313.1 million, for $1.38 per diluted

share, for the same period in 1999.  Exclusive of certain nonrecurring items during 2000, net income

for 2000 totaled $610.8 million, or $2.67 per diluted share.  Additionally, the Company reported:

> Fourth Quarter 2000 vs. Fourth Quarter 1999
>
> Stilwell, which includes Janus, Berger LLC, Nelson Money
> Managers PLC and an approximate 33% equity investment in DST,
> reported $257.8 billion in assets under management as of December
> 31, 2000 compared to $257.4 billion as of December 31, 1999.
> Average assets under management totaled $284.7 billion during
> fourth quarter 2000 compared to $208.5 billion in prior year's fourth
> quarter, $324.2 billion in third quarter 2000 and $304.2 billion in
> second quarter 2000.  For the quarter, market depreciation of $57.0
> billion and slight net cash outflows (less than $1 billion) resulted an
> 18% decline in assets under management.  This decline in assets
> under management generally reflected the net effect to the Company
> of the widely varied fourth quarter 2000 results for the key market
> indexes (e.g., an approximately 33% decline in the Nasdaq, an 8%
> decline in the Russell 2000, a 1% increase in the Dow Jones
> Industrial Average).   Shareowner accounts increased by
> approximately two million compared to December 31, 1999 and

totaled approximately 6.3 million as of December 31, 2000.

Operating margins improved in fourth quarter 2000 versus the comparable 1999 period.  This improvement is attributable to the 38% increase in revenues, as well as continued success in maintaining an efficient cost structure.  Operating expenses of $287.3 million for fourth quarter 2000 exceeded comparable 1999 by $74.5 million, or 35%, but were 9% below third quarter 2000 expenses. The increase in expenses over prior year occurred in the following key categories: i) compensation, primarily related to an increase in the number of employees; ii) third party concession fees resulting from a higher level of assets under management through these distribution arrangements; iii) depreciation and amortization arising from Janus' infrastructure enhancement efforts over the last two years and deferred commission payments in connection with the growth in the Janus World Funds PLC; and iv) professional services fees associated with ongoing web development and maintenance efforts.

Full Year 2000 vs. Full Year 1999

For the year ended December 31, 2000, net cash inflows of assets totaled $68.4 billion (of which Janus contributed $66.9 billion).  This industry-leading total was substantially offset by market depreciation of $68.0 billion.  Average assets under management increased $137.7 billion, or 84%, compared to the average for the year ended December 31, 1999, resulting in a more than $1 billion improvement in revenues.

Operating margins improved from 42.8% to 46.1% year to year, mirroring the strong improvement quarter to quarter.   Higher operating expenses were evident in the same cost components noted in the quarterly discussion above.  Compensation and third party concession costs were approximately 36% of total revenues during the year ended December 31, 2000 compared to approximately 38% in 1999.  With numerous infrastructure enhancements completed throughout 1999 and 2000 and a 132% increase in deferred commission payments resulting from the growth of Janus' offshore funds, depreciation and amortization grew nearly 130% in 2000 versus 1999.  The rapid increase in assets under management during the first half of the year generated significant shareowner activity, thereby requiring substantial temporary employee help, which is recorded as professional services fees.  The rate of increase in the remaining operating expenses on a combined basis (approximately 51%) continues to trail the rate of revenue growth, thereby

21

contributing to Stilwell's competitive operating margins.

59.    Commenting on these results, Landon H. Rowland, Stilwell's Chairman, President and Chief Executive Officer stated:

> We are pleased to report Stilwell's record quarterly and full year earnings. For the year, Stilwell's revenues, operating income and net income each grew by more than 85% compared to 1999. These results demonstrate the fantastic achievements of our subsidiaries and highlight the ongoing efforts, diligence and dedication of their management teams.
>
> Movements in Stilwell's assets under management during the fourth quarter generally followed the markets, with market depreciation comprising virtually the entire decline in assets during the quarter. While net flows of cash were essentially flat during the fourth quarter, the $68.4 billion in net inflows for the year were best in the mutual fund industry. During 2000, Janus closed five funds – including its flagship Janus Fund – with the objective of ensuring ongoing success for existing fund shareowners. These funds totaled nearly 50% of Janus' total assets under management. We are also pleased with the ability of the subsidiaries to develop alternative distribution and service options for shareholders and the contribution of these actions to year-end results.
>
> We believe Stilwell is well-positioned to build on the momentum generated during 1999 and 2000. Each of Stilwell's investments – Janus, Berger, Nelson and DST – continues to develop and promote its brand name and its comparative advantages. During the third and fourth quarters of 2000, as part of Stilwell's $1 billion stock repurchase program, the Company repurchased more than 7 million shares of its common stock through open market transactions. We believe that this investment, much like the investment in our various subsidiaries and affiliates, will prove to be value-enhancing to our existing shareholders. Additionally, we believe the purchase of Janus stock from Tom Bailey will provide an outstanding opportunity to enhance the management incentives at Janus.

60.    On March 20, 2001, the Company filed its annual report with the SEC on Form 10-K. Therein, the Company reaffirmed its previously announced results.

61.    On April 23, 2001, the Company issued a press release announcing its

financial results for the first quarter 2001.  At that time, the Company reported first quarter 2001 net income of $111.4 million or 48¢ per diluted share, compared to $188.7 million, or 84¢ per diluted share in first quarter 2000.  Average assets under management in the first quarter were $246.6 billion, a 16% decrease from the same period in 2000.

> 62.    On May 15, 2001, the Company filed its quarterly report with the SEC on Form 10-Q.  The Company's Form 10-Q reaffirmed its previously announced financial results.

> 63.    On July 25, 2001, the Company issued a press release announcing its financial results for the second quarter 2001.  At that time, the Company reported second quarter 2001 net income of $104.5 million or 46¢ per diluted share, compared to $150.8 million, or 66¢ per diluted share, in second quarter 2000.  For the six months ended June 30, 2001, Stilwell reported net income of $216.4 million, or 94¢ per diluted share, compared to $293.7 million, or $1.29 per diluted share for the same 2000 period.  Average assets under management in the second quarter were $223.9 billion, a 26% decrease from the same period in 2000.

> 64.    On August 14, 2001, the Company filed its quarterly report with the SEC on Form 10-Q.  The Company's Form 10-Q reaffirmed its previously announced financial results.

> 65.    On October 24, 2001, the Company issued a press release announcing its financial results for the third quarter 2001.  At that time, the Company reported third quarter 2001 net income of $90.5 million, or 39¢ per diluted share, compared to $170.1 million, or 73¢ per diluted share, in third quarter 2000.  For the nine months ended September 30, 2001, Stilwell reported net income of $306.9 million, or $1.33 per diluted share, compared to $463.8 million, or $2.02 per diluted share, for the same period in 2000.

> 66.    On November 14, 2001, the Company filed its quarterly report with the SEC

on Form 10-Q.  The Company's Form 10-Q reaffirmed its previously announced financial results.

67.    On January 30, 2002, the Company announced its financial results for the fourth quarter and year-end 2001.  At that time, Stilwell reported net income of $84 million, or 37¢ per diluted share, during the fourth quarter 2001 compared with net income of $147 million, or 64¢ per diluted share, in the fourth quarter 2000.  For the full year 2001, Stilwell's net income was $390.9 million, or $1.70 per diluted share, compared with $610.8 million, or $2.67 per diluted share, for the same period in 2000.  Additionally, the Company reported:

> Average assets under management totaled $186.3 billion during fourth quarter 2001, compared to $198.0 billion in third quarter 2001 and $284.7 billion in fourth quarter 2000.  The lower level of average assets under management in fourth quarter 2001 versus 2000 resulted in a 37 percent decrease in revenues quarter-to-quarter (to $334.1 million from $530.5 million).

> During the year ended December 31, 2001, assets under management declined $65.6 billion (from $257.8 billion to $192.2 billion), of which approximately 92 percent was attributable to market depreciation.  Average assets under management during the year ended December 31, 2001, totaled $213.5 billion, compared to $301.9 billion in 2000, resulting in a decrease in revenues from $2,248.1 million in 2000 to $1,555.7 million in 2001.  With lower revenues and the expected margin pressures noted in the fourth-quarter discussion, Stilwell reported a 41 percent decline in ongoing operating income in 2001 versus 2000.

68.    Commenting on these results, Landon H. Rowland, Stilwell's Chairman, President and Chief Executive Officer stated:

> The company's impressive EBITDA margins reflect the benefit of Stilwell's $1.5 billion additional investment in Janus during 2001, as well as the strong operating margins achieved at Janus through aggressive cost controls.  We believe these margins are a strong indicator of the financial strength and value of our company.

> Stilwell reported an ongoing operating margin of 38.9 percent in fourth quarter 2001 and 39.4 percent for full year 2001.  The

24

company's ability to maintain these margins is indicative of the variability in the Janus business model and the savings generated from its emphasis on electronic shareowner servicing. Excluding the amortization expense associated with the company's additional investments in Janus during the year, the ongoing operating margin for the three months and year ended December 31, 2001, was 43.6 percent and 41.8 percent, respectively.

As we move into 2002, each of our core organizations provides opportunities to add shareholder value. Janus is poised to regain momentum through efforts to improve investment performance, its strategic diversification of distribution channels and quality brand name. Berger, through the acquisitions of Bay Isle and INTECH, has strengthened its franchise and established a well-rounded foundation for growth. Nelson continues its steady growth through development of a multi-tiered savings gateway for employees throughout the United Kingdom. These subsidiaries, together with the consistently strong earnings growth at DST, provide the foundation for Stilwell's future.

69.     On March 20, 2002, the Company filed its annual report with the SEC on Form 10-K. Therein, the Company reaffirmed its previously announced results.

70.     On April 25, 2002, the Company issued a press release announcing its financial results for the first quarter 2002. At that time, the Company reported first quarter 2002 net income of $97.2 million, or 42¢ per diluted share, compared to $111.4 million, or 48¢ per diluted share, in first quarter 2001. Average assets under management in the first quarter were $188.8 billion, a 27% decrease from the same period in 2000.

71.     On May 15, 2002, the Company filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q reaffirmed its previously announced financial results.

72.     On July 25, 2002, the Company issued a press release announcing its financial results for the second quarter of 2002. At that time, the Company reported second quarter 2002 net income of $73.7 million, or 30¢ per diluted share, compared to $90.4 million, or 39¢ per diluted

share, in second quarter 2001. For the six months ended June 30, 2002, Stilwell reported net income of $170.9 million, or 72¢ per diluted share, compared to $201.8 million, or 88¢ per diluted share, for the same 2001 period.

73.    On August 14, 2002, the Company filed its quarterly report with the SEC on form 10-Q. The Company's Form 10-Q reaffirmed its previously announced financial results.

74.    As stated previously, on September 3, 2002, Stilwell announced that it would merge its operations into a unified organization that would market and distribute its investment products globally under the Janus brand name. Additionally, Stilwell stated that Janus would be led by Mark Whitson, who would become Chief Executive Officer on December 31, 2002, the expected date of the merger. An 11-year Janus veteran, Whitson served as president of retail and institutional services. As part of the merger, Janus would be responsible for the strategic direction of Stilwell's investment management subsidiaries. These subsidiaries include Janus Capital Management LLC; Berger Financial Group LLC, which owns Enhanced Investment Technologies LLC ("INTECH") and Bay Isle Financial LLC; and U.K.-based Nelson Money Managers Plc. Collectively, these firms manage approximately $150 billion in assets.

75.    On October 30, 2002, the Company issued a press release to announce its financial results for the third quarter of 2002. Therein, the Company reported a net loss of $131.2 million, or (60¢) per diluted share, during third quarter 2002 compared to net income of $26.8 million, or 11¢ per diluted share, in third quarter 2001. For the nine months ended September 30, 2002, Stilwell's net income was $39.7 million, or 12¢ per diluted share, compared to $228.6 million, or 99¢ per diluted share, for the same 2001 period.

76.    On November 14, 2002, the Company filed its quarterly report with the SEC

on Form 10-Q.  The Company's Form 10-Q reaffirmed its previously announced financial results.

77.      On January 2, 2003, Janus announced that following the merger of Janus Capital Corporation and Stilwell Financial Inc., which became effective on January 1, 2003, shares of the new organization – Janus Capital Group Inc. – began trading on the New York Stock Exchange under the ticker symbol JNS.

78.      On January 30, 2003, Janus announced its financial results for the fourth quarter and year-end 2002.  At this time, Janus reported net income of $45.0 million, or 18¢ per diluted share, during the fourth quarter 2002 compared with net income of $73.7, or 32¢ per diluted share, in the fourth quarter 2001.  For the full year 2002, Janus' net income was $84.7 million, or 31¢ per diluted share, compared with $302.3 million, or $1.31 per diluted share, for the same period in 2001.  The Company's 2002 earnings reflect decreased average assets under management as well as the effects of significant non-recurring items reported in the third quarter 2002.  Excluding these non-recurring items, net income for 2002 totaled $244.0 million, or $1.02 per diluted share, compared with $390.9 million, or $1.70 per diluted share in 2001.  Additionally, the Company reported:

> Fourth Quarter 2002 vs. Fourth Quarter 2001
>
> Janus Capital Group ended the year reporting assets under management of $138 billion, compared with $140 billion as of September 30, 2002 and $193 billion as of December 31, 2001. Assets under management include assets from Janus' investment management subsidiaries: Janus Capital Management LLC; Berger Financial Group LLC, which owns Enhanced Investment Technologies, LLC (INTECH) and Bay Isle Financial LLC; and Nelson Money Managers plc.  The total also includes the small- and mid-cap value assets that Perkins, Wolf, McDonnell and Company manages for Berger retail and institutional shareholders.  The slight decrease in assets during the quarter reflected market appreciation of $3 billion offset by net redemptions of $5 billion.

27

Full Year 2002 vs. Full Year 2001

During the year ended December 31, 2002, assets under management decreased $54 billion – from $192 billion to $138 billion. This decline reflected market depreciation of $42 billion, net outflows of $18 billion and increased assets of $6 billion from Berger's acquisition of INTECH. Average assets under management in 2002 declined 23% to $164 billion from $214 billion in 2001. These lower average assets under management led to a 26% decrease in annual revenue – from $1.5 billion to $1.1 billion.

79.     Commenting on these results, Whitson stated:

Today's financial results reflect the challenging environment reflect the challenging environment for growth-orientated investment managers, but I'm confident that we're taking the necessary steps to ensure that Janus is well positioned for future growth[.]... Since we merged Janus and Stilwell, we've made remarkable progress in a very short time.

Earlier this month, Janus introduced seven new value funds and risk-managed equity products to complement its growth-orientated lineup.

Broadening our product offerings is an important step toward improving our top-line growth[.]... We're also focused on controlling costs to manage our business as efficiently as possible.

Nothing is more important to me than improving performance, and we saw signs last year that the steps we're taking to that end are paying off[.]... Our improved relative performance and the results from our more conservative products were bright spots in 2002.

Our focus in 2003 will be to continue improving performance, while leveraging Janus' global distribution network and managing our expenses[.]

80.     On March 28, 2003, the Company filed its annual report with the SEC on Form 10-K. Therein, the Company reaffirmed its previously announced results.

81.     On April 29, 2003, Janus announced, via a press release, its financial results for the first quarter of 2003. Therein, Janus reported net income of $38.6 million, or 17¢ per diluted

28

share, during the first quarter 2003 compared with $45.0 million, or 20¢ per diluted share in the

preceding quarter, and $97.2 million, or 42¢ per diluted share in the first quarter of 2002.  Average

assets under management in the first quarter 2003 totaled $136.4 billion, a 23% decline from the

same period in 2001.  This lower level of average assets under management caused the company's

revenues to drop 26%–to $284.3 million–from $334.1 million in the fourth quarter of 2001.

82.     On May 15, 2003, the Company filed its quarterly report with the SEC on

Form 10-Q.  Therein, the Company reaffirmed its previously announced results.

83.     On July 30, 2003, Janus issued a press release to announce its financial results

for the second quarter of 2003.  Therein, Janus reported net income of $47.5 million, or 21¢ per

diluted share, on revenues of $250.6 million for the quarter ended June 30, 2003.  The firm reported

net income of $73.7 million, or 33¢ per diluted share, on revenues of $310.4 million in the

comparable 2002 quarter.  In the first quarter of 2003, net income was $38.6 million, or 17¢ per

diluted share, on revenues of $235.5 million.  Assets under management at June 30, 2003, totaled

$149.8 billion, an increase of $17.1 billion, or 12.9% from the $132.7 billion reported at March 31,

2003, due to $1.6 billion in net inflows combined with $15.5 billion of market appreciation.  Of the

$1.6 billion in net inflows, $0.2 billion were long-term assets and $1.4 billion came from money

markets.

84.     On August 12, 2003, the Company filed its quarterly report with the SEC on

Form 10-Q.  Therein, the Company reaffirmed its previously announced results.

85.     The financial statements referenced above were each materially false and

misleading because they failed to disclose and/or misrepresented the following adverse facts, among

others: (1) that Janus entered into secret, illegal agreements with several hedge funds wherein Janus

permitted the hedge funds to time Janus mutual funds; (2) that in exchange for permitting the hedge funds to time Janus mutual funds, those hedge funds deposited "sticky assets" into certain Janus money market funds; (3) that the "sticky assets" deposited into certain Janus money market funds permitted Janus to materially overstate its assets under management and thus permitted Janus to receive a steady flow of fees from such "sticky assets;" and (4) as a result of this illegal scheme, Janus, throughout the Class Period, materially overstated and artificially inflated Janus' income and earnings per share.

### THE TRUTH EMERGES

86.     On September 3, 2003, New York Attorney General Eliot Spitzer filed a complaint in New York Supreme Court against a hedge fund manager named Canary Partners.  The complaint (the "Spitzer Complaint," the contents of which are incorporated by reference herein) charged Canary and its principals with secretly paying several mutual fund managers (including Janus) to allow Canary to engage in, *inter alia*, market timing trades in those mutual funds.  The investigation was triggered by a call from a former employee at Canary saying that Canary had secret agreements with Janus and other mutual fund managers to market time funds.  The Attorney General's office interviewed several people associated with Canary and subpoenaed documents, including internal e-mail communications, from Janus and other mutual fund companies prior to filing its complaint.

87.     The Spitzer Complaint alleged, with regard to Janus, as follows, among other things:

> In or about April, 2002, Janus granted permission for Canary to time the Janus Mercury fund.  In exchange, Canary deposited "sticky" money into a Janus money market fund.  Canary timed the Janus Mercury fund during 2002 and 2003.  Canary also received capacity

to time the Janus High Yield fund.

In early 2003, Canary sought timing capacity in Janus' offshore funds.  Through an intermediary, it contacted Janus and offered "sticky" assets in exchange for this additional timing capacity.  (JCG 000277-000278)[1]  In response, a concerned Janus employee sent e-mails to Richard Garland, the CEO of Janus International, expressing alarm over the volume of market timing activity in Janus Mutual Funds:

> I'm getting more concerned w/ all of these market timers and how they are affecting our PM's [i.e., Portfolio Managers] trading activity. [Portfolio Managers] have voiced their sensitivity on a number of occasions re: this type of activity in JWF.  I spoke to [a Janus employee] and confirmed that this is a big problem domestically and I want to avoid this at all cost before it gets too problematic offshore.  Now that we have our exchange limitation in our prospectus, I would feel more comfortable not accepting this type of business because its too difficult to monitor/enforce & it is very disruptive to the PM's & operation of the funds.  Obviously, your call from the sales side.

(JCG 000277)

[A] Janus employee also recommended to Garland [then CEO of Janus International] that Janus refuse the additional business from Canary due to the issues created for portfolio managers: "For now, I don't think we should take-on additional business of this nature.... We need to keep our funds clean & minimise [sic] issues for PM's/fund performance.  Do you agree?"

Garland did not agree.  He replied: "I have no interest in building a business around market timers, but at the same time **I do not want to**

---

[1]Citations bearing the prefix "JCG" refer to production numbers of internal documents that Attorney General Spitzer obtained from Janus in the course of his investigation.  These documents and Attorney General Spitzer's complaint were made publicly available on the New York Attorney General's website attached to the press release announcing the filing of the complaint.  The Attorney General's complaint and the referenced supporting documents are incorporated herein by reference.

**turn away $10-$20m!**  How big is the [Canary] deal...?"  After learning that Canary's timing could amount to between **$10 and $50 million dollars**, Garland gave the "[g]o ahead" for Canary's additional timing capacity on April 3, 2003.

(Emphasis added).

88.    Additionally, the Spitzer complaint alleged, referencing and attaching additional evidence:

> **Managing the extensive timing activity in its funds became difficult for Janus.**  In early June, 2003, it began to consider adopting a consistent policy on market timing.  Discussion concerning development of such a policy was opened up to certain Janus employees.  Comments included:

> • **"Our stated policy is that we do not tolerate timers.  As such, we won't actively seek timers, but when pressed and when we believe allowing a limited/controlled amount of timing activity will be in JCG's best interests (increased profitability to the firm) we will make exceptions under these paramaters."**  (JCG 000605)

> • "My own personal recommendation is not to allow timing, period, and follow the prospectus.... [T]imers often hide multiple accounts and move on the same day which could hurt other investors and enrage the Pms....I don't think the static assets that we might be able to hold onto are worth the potential headaches, nor does this fall into our 'narrow and deep' focus.  **I suggest we maintain the timing agreements we have, but allow no more."**  (JCG 000569-570)

> • **"[I]f we are going to allow timing, we want to be sure that there are enough static assets [i.e., "sticky" assets] so that we are making a decent profit for all the trouble we are put through."**  (JCG 000569)

(Emphasis added).

89.    The Company never denied the allegations in the Spitzer Complaint; in fact, following September 3, 2003, Janus admitted to the facts alleged in the Spitzer Complaint and many others that prove the arrangements to allow market timing in contravention of the Company's stated

policies were much more widespread than previously imagined.

90.     On September 3, 2003, Janus issued a press release to discuss its reaction to the filing of a complaint against the Company, among others.  In it, the Company stated:

> Janus Capital Management intends to continue cooperating with the New York Attorney General's inquiry.  Janus is reviewing the complaint closely and is committed to ensuring that the company continues to act in the best interest of Janus fund shareholders.

91.     On this revelation Janus Capital's shares began the descent that has ultimately wiped out hundreds of millions of dollars of market capitalization.  This share price decline, in reaction to disclosure of the truth concerning defendants' statements and activities, caused injury to plaintiff and members of the class.

92.     On September 5, 2003, Janus issued a press release that discussed specific steps the Company planned to take in response to Spitzer's allegations.  The company reported in part:

> On Wednesday, Attorney General Spitzer announced that he is investigating trading practices in the mutual fund industry. The investigation was prompted by the Attorney General's settlement with a hedge fund, Canary Capital Partners LLC, which allegedly engaged in irregular trading practices with certain mutual fund companies.
>
> "We've long viewed market timing as an industry wide problem involving both mutual funds and the many intermediaries with whom investors work," Whiston said. "Regardless, we have to do what's right for our fund shareholders. It's our hope that the measures we're announcing today will help resolve this situation in a way that recognizes the importance of the matter. Most of all, we hope this action demonstrates that Janus is committed to living up to the high ethical standards that our shareholders expect of us."

93.     On October 29, 2003, Janus issued a press release announcing its financial results for the third quarter of 2003.  Therein, the Company reported in part:

Janus Capital Group Inc. today reported third-quarter net income of $50.9 million, or $0.22 per diluted share, on revenues of $256.6 million. The quarterly net income includes a preliminary charge of $9.0 million to account for costs related to the investigation into mutual fund trading.

In the second quarter of 2003, net income totaled $47.5 million, or $0.21 per diluted share, on revenues of $245.5 million. In the third quarter of 2002, the firm reported a net loss of $131.2 million, or $0.59 per diluted share, from revenues of $252.7 million. The loss in the third quarter of 2002 was caused in part by a non-cash deferred income tax charge of $107.8 million and a corporate restructuring charge of $59.4 million.

94.     As shocking as the Spitzer Complaint's allegations were, they were the tip of the iceberg.  Janus' secret deals, in contravention of its publicly-stated policies, were not limited to the arrangements from 2002 with Canary that were described in the Spitzer complaint.  Janus would eventually admit that the secret market timing arrangements covered a much longer time period and involved many more hedge funds.

95.     In December 2003, Janus acknowledged that it had special trading arrangements with 10 investors starting November 2001 and continuing to mid-2003.  Janus admitted that the market timers made millions of dollars in profits and some of the agreements with Janus involved the waiver of redemption fees (which were meant to discourage market timing).

96.     As was reported by Bloomberg and others on December 19, 2003, Janus admitted that 10 unidentified investors were permitted to buy and sell shares more frequently than was normally allowed.  The trading began in November 2001 and occurred as recently as the first half of 2003 with net gains realized by the investors exceeding $20 million.

97.     On Monday, November 17, 2003, Janus announced that Richard Garland, Chief Executive of Janus International, had resigned.  Garland's name had emerged in the initial

investigation in September which included an e-mail that Garland wrote concerning an arrangement to allow Canary Capital Partners to engage in market timing trades in Janus Funds.

98.     As was reported by Bloomberg and others on September 30, 2003, Janus admitted that it had earned money from market timing in 7 different funds: Janus Mercury Fund, Janus Worldwide Fund, Janus Enterprise Fund, Janus High-Yield Fund, Janus Overseas Fund, Janus Adviser Worldwide Fund, and the Janus Adviser International Growth Fund.

99.     As a result of these admissions, the Company was forced to pay huge sums to settle claims with regulators, restructure senior management and restore investor confidence in the future of Janus.

100.    On April 27, 2004, Janus agreed to cut fees by $125 million and pay $101 million in penalties to settle allegations by New York and Colorado regulators.

101.    Standard & Poor's reported that Janus experienced $8.1 billion in net redemptions in fourth quarter 2003 and $10.5 billion in net redemptions in the first quarter 2004.

102.    As the Wall Street Journal reported on April 27, 2004, the settlement announced that day was more than triple the amount Janus had previously said it would repay to fund shareholders as a result of the market timing and allegations. The Wall Street Journal also reported that "[i]n addition to the monetary penalties, Janus agreed to a requirement that the Chairman of its mutual fund boards be 'truly independent'. Until March of 2004, Janus founder and former Chief Executive, Tom Bailey served in that role."

103.    As the Wall Street Journal reported on April 21, 2004, in the wake of the scrutiny, Mr. Whitson stepped down as Chief Executive Officer. His departure followed that of Richard Garland, the head of Janus' international operations, who stepped down in November 2003.

Earlier in April 2004, Lars A. Soderberg, head of Janus' institutional business agreed to take a leave of absence.

104.    As the New York Law Journal reported on August 19, 2004, Janus agreed to settle charges brought by the Securities and Exchange Commission by paying over $100 million. The S.E.C. "found that Janus made arrangements with 12 entities allowing them to market time several funds managed by the advisory group."

### IMPACT OF THE REVELATIONS ON JANUS CAPITAL AND ITS STOCK

105.    On April 27, 2004, Janus reported a first quarter net loss of $19.3 million or $0.08 a share.  The company took the charge of $59 million or $0.21 a share for civil penalties, restitution, payments and legal charges relating to the allegations of improper market timing trades (Bloomberg 4/28/04).

106.    As the Wall Street Journal reported on February 5, 2004, Janus booked a fourth quarter charge of $62.8 million directly related to the admitted market-timing-related misconduct, and warned that further charges may come.

107.    As the Wall Street Journal article reported on April 28, 2004:

> For Janus, the settlements pale in comparison to the damage already done by the trading scandal.  Janus now oversees $145 billion in assets, down from $320 billion at the peak of the technology stock above early 2000....  In the first 8 months of last year [2003], investors withdrew a net $5.1 billion from Janus funds according to financial research group.  Between September [2003] and February [2004], investors yanked out an additional $14 billion.

108.    An April 28, 2004 Bloomberg article added that investors took out $7.7 billion from Janus mutual funds in the first quarter of 2004.

36

109.     Bloomberg reported on March 8, 2004 that several institutional clients, including insurers for which Janus serves as a sub-adviser, announced plans to replace Janus as a manager of billions of dollars of assets.

110.     It was entirely foreseeable that the Spitzer Complaint allegations and Janus' additional subsequent admissions would cause large numbers of investors to divest from the Janus Funds.  After all, the capital of long-term investors had been attracted through a series of public misrepresentations concerning Janus' policies toward market timing.  Long term investors were less likely to invest in a fund that encouraged market timing, and most investors were less likely to invest in a fund that engages in secret contravention of its publicly-stated policies.

111.     It was also entirely foreseeable that the revelations concerning the secret market timing arrangements would have material impact on Janus Capital's common stock price. After all, Janus Capital depended on fund investments for revenue, and when the truth concerning Janus became known, fund investments – many of which had been procured through fraudulent misrepresentations – were likely to decline (and, in fact, they did), and Janus was likely to face liability to regulatory agencies and fund investors (which, in fact, it did).

112.     Equity market reaction to the news of Janus' misconduct was swift and demonstrates the severity and materiality of the Company's misconduct.  Shares of Janus Capital stock fell noticeably throughout September 2003, as the truth concerning Janus' misconduct was revealed to the public.  Janus Capital's common stock traded at $17.68 per share on September 2, 2003, just before the allegations of the Spitzer Complaint were revealed publicly.  By September 4, it had plunged 12.7% to $15.60.  By September 26, it had fallen to $13.50.  The average price of Janus common stock for the 90 days following the end of the Class Period was $14.42, which is

19.26%, or $3.44, below Janus' closing price on the last day of the Class Period.  This price decline

which resulted from revelation of the truth concerning defendants' misrepresentations, omissions

and misconduct caused injury to plaintiff and the class members.

## ADDITIONAL SCIENTER ALLEGATIONS

113.   As alleged herein, defendants acted with scienter in that defendants knew that

the public documents and statements issued or disseminated in the name of Janus were materially

false and misleading; knew that such statements or documents would be issued or disseminated to

the investing public; and knowingly and substantially participated or acquiesced in the issuance or

dissemination of such statements or documents as primary violations of the federal securities laws.

As set forth elsewhere herein in detail, defendants, by virtue of receipt of information reflecting the

true facts regarding Janus, their control over, and/or receipt and/or modification of Janus' allegedly

materially misleading misstatements and/or their associations with the Company which made them

privy to confidential proprietary information concerning Janus, participated in the fraudulent scheme

alleged herein.

114.   Defendants knew and/or recklessly disregarded the falsity and misleading

nature of the information which they caused to be disseminated to the investing public.  The ongoing

fraudulent scheme described in this Second Amended Complaint could not have been perpetrated

over a substantial period of time, as has occurred, without the knowledge and complicity of the

personnel at the highest level of the Company.

115.   Fees from the management of mutual funds have constituted in excess of 90%

of the Company's revenue and income.  At all relevant times Janus' management has taken a

primary interest in the way their mutual funds are managed because income from these funds

38

represents almost all of the Company's income.  As such, management had a duty to be involved in decisions regarding or at a minimum aware of agreements entered into by Janus Funds and certain large investors.

116.    The Wall Street Journal on April 27, 2004 quoted New York Attorney General Elliot Spitzer as saying, "[t]he behavior here was made more problematic because of the knowledge ... [which went] up to the very senior levels in the management of the Janus funds."

117.    Management's knowledge of the misconduct is evidenced by the emails from Mr. Garland revealed in the Spitzer Complaint.  Garland was not some low-level manager.  As the Wall Street Journal reported on April 6, 2004, Messrs. Garland and Soderberg (who also resigned in the wake of the scandal) reported directly to Janus Chief Executive, Mark Whitson.

118.    Mr. Whitson himself ordered a study of market timing in Janus' funds and received the results of the study in November 2002, according to a Wall Street Journal report published on April 21, 2004.  Yet, the market timing trades continued until at least 2003 according to the complaint filed against Canary by Attorney General Elliot Spitzer in September.

119.    According to Dow Jones news on March 26, 2004, CBS Market Watch claimed to have obtained an internal Janus memorandum that shows that Mr. Whitson and other Janus senior managers knew about the market timing trades in 2002.

120.    In any event, Janus' knowledge of the misconduct occurred through the actions of Mr. Garland and other fund managers who authorized the market timing arrangements. Moreover, it is reasonable to infer that Janus' senior management knew of the misconduct or, at the very least, was reckless in not knowing, given the undisputable knowledge on the part of Mr. Garland, and others who reported directly to Mr. Whitson, and given the study Mr. Whitson  had

commissioned, and given the importance of the mutual fund operations to the overall business of defendants Janus Capital and Janus Management.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE-MARKET DOCTRINE

121.   The market for Janus Capital common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Janus' publicly traded securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Janus Capital common stock relying upon the integrity of the market price of those securities and market information relating to Janus, and have been damaged thereby.

122.   During the Class Period, defendants materially misled the investing public, thereby inflating the price of Janus Capital common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

123.   At all relevant times, the material misrepresentations and omissions particularized in this Amended Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Janus' business, operations and operating policies, thus causing Janus Capital common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in

40

plaintiff and other members of the Class purchasing Janus Capital securities at artificially inflated prices, thus causing the damages complained of herein.

124.    At all relevant times, the market for Janus Capital common stock was an efficient market for the following reasons, among others: (a) Janus Capital stock met the requirements for listing, and was listed and actively traded on the NYSE, the largest stock market in the United States, with more than 235 million shares outstanding and average daily trading volume significantly in excess of 1 million shares; (b) as a regulated issuer, Janus Capital filed periodic public reports with the SEC and the NYSE, including S-3 registrations; (c) Janus regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services, and Janus fund prospectuses were publicly available through, *inter alia*, various online sources; and (d) Janus Capital was followed by securities analysts at several major securities firms, including, *inter alia*, UBS, CIBC World Markets and Morgan Stanley, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

125.    As a result of the foregoing, the market for Janus Capital publicly traded securities promptly digested current information regarding Janus from all publicly available sources and reflected such information in Janus Capital's stock price.  Janus Capital's stock price reacted promptly to material information about the Company.  Under these circumstances, all purchasers of Janus Capital publicly traded securities during the Class Period suffered similar injury through

their purchase of those securities at artificially inflated prices, and a presumption of reliance applies.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

126.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

127.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein and (ii) cause plaintiff and other members of the Class to purchase Janus Capital securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

128.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Janus Capital securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Both defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

129.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and

42

operations of Janus as specified herein.

130.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Janus' value and performance, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Janus, its financial performance and its business operations and its policies concerning market timing in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Janus Capital during the Class Period.

131.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Janus' operating condition, financial performance and true operating policies from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' overstatements and misstatements of the Company's business and operations throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

132.    As a result of the dissemination of the materially false and misleading

information and failure to disclose material facts, as set forth above, the market price of Janus Capital's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Janus Capital's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Janus Capital securities during the Class Period at artificially high prices and were damaged when the shares that they still held declined upon public revelation of the true nature of defendants' conduct.

133.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known the truth regarding Janus' illegal agreements with market timers, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Janus Capital securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

134.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

135.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of Janus Capital securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against Janus Capital

136.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

137.    Janus Management is the largest and most important subsidiary of Janus Capital.  The operation of Janus Management was ultimately the responsibility of Janus Capital.  Janus Capital had the power to control Janus Management and did exercise this power.

138.    Furthermore, Helen Hayes was during all or part of the Class Period a director of Janus Capital.  Additionally, Ms. Hayes served as Managing Director of Investments and as a portfolio manager at Janus Management.  She served in a day-to-day supervisory position at Janus Management and had the power to control its operations.

139.    Mark Whitson, before becoming Chief Executive Officer and President of Janus Capital, served as President of Retail and Institutional Services for Janus Management during part of the class period.  Prior to the formation of Janus Management he held the same position with Janus Capital Corporation.  Moreover, Mr. Whitson commissioned an inquiry into market timing of Janus Funds, the results of which he received in 2002 (*see* ¶ 118, *supra*).  Mr. Whitson knew about the misconduct.  Acting on behalf of Janus Capital, Mr. Whitson, and through him, Janus Capital, had and exercised the power to control the activities of Janus Management.

140.    As set forth above, Janus Management violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint.  By virtue of its position as a controlling person, Janus Capital is liable on account of Janus Management's fraud pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, lead plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action, designating lead plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and lead plaintiff's counsel as Class Counsel;

(b)     Awarding compensatory damages in favor of lead plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 2, 2006

KIRBY McINERNEY & SQUIRE, LLP


By:_____/s/ Ira M. Press_____
          Ira M. Press
          Alice McInerney
830 Third Avenue, 10th Floor
New York, New York  10022
(212) 371-6600

Lead Counsel for the Janus Parent Investor Sub-Subtrack

46

Marc S. Henzel, Esq.
LAW OFFICES OF MARC S. HENZEL
273 Montgomery Avenue, Ste 202
Bala Cynwyd, PA  19004-2808
(610) 660-8000

Co-Counsel for Plaintiff First Derivative Traders